

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 7, 2017 Session

## ALEXANDER HAYDEL v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
#### No. 12-00988    Lee V. Coffee, Judge
_____

### No. W2016-00667-CCA-R3-PC
_____

Alexander Haydel ("the Petitioner") pled guilty to two counts of first degree murder and received two consecutive sentences of life without the possibility of parole. The Petitioner filed a petition for post-conviction relief; the post-conviction court denied the petition, and the Petitioner appealed. On appeal, the Petitioner argues that lead trial counsel's performance was deficient because "he misled the [Petitioner] in the events leading up to the [Petitioner's] entering a guilty plea." The Petitioner asserts that he was prejudiced by lead trial counsel's deficient performance because absent that advice he would have proceeded to trial. Additionally, the Petitioner argues that his guilty pleas were entered unknowingly and involuntarily due to lead trial counsel's deficient performance. After a thorough review of the record and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JAMES CURWOOD WITT, JR., J., joined.

James Jones, Jr., Memphis, Tennessee, for the appellant, Alexander Haydel.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Nichols and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual and Procedural Background

On February 28, 2012, the Petitioner was indicted by the Shelby County Grand Jury for two counts of first degree premeditated murder and one count of aggravated assault. The State filed a death penalty notice on April 18, 2012.

*Guilty Plea Submission Hearing*

On January 14, 2014, the Petitioner pled guilty to two counts of first degree murder. As a part of the plea agreement, the State withdrew its death penalty notice, the charge of aggravated assault was dismissed, and the Petitioner received two consecutive sentences of life without parole. During the guilty plea submission hearing, the State offered the following recitation of facts in support of the Petitioner's pleas:

> Had this matter gone to trial, the [S]tate's proof would have been that on July the 3rd, 2011, [the Petitioner]; his wife, Bobby Warren Haydel; her ex-husband, Arthur Warren; and other family and friends traveled to Memphis from Cleveland, Mississippi, to celebrate the 4th of July.

> When they got here, about 1:30 in the afternoon, they checked into the Double Tree Hotel located at 185 Union Avenue. After they checked in, the majority of the group went to Beale Street for the afternoon. Included in that group [were] [the Petitioner] and his wife, Bobby Warren Haydel. Some of the group went back to the hotel. [The Petitioner and Mrs. Haydel], and perhaps others, stayed there on Beale Street. [The Petitioner and Mrs. Haydel] got into an altercation at some point late in the afternoon. According to both the [Petitioner] and his wife, they had this altercation, and [the Petitioner] either pushed or hit her and then bit her lower lip.

> After that happened, the two of them went back to the hotel. When they got there, she went to their room, and [the Petitioner] went to the valet at the Double Tree; asked the valet to take him to the parking deck; and once he got to the parking deck, he was escorted to a Chevy Impala where he retrieved a thirty-eight caliber pistol. He was also taken to a Mercury Mariner where he got another thirty-eight. Both of those vehicles were vehicles driven by [the Petitioner] or his party to get here.

[The Petitioner] put both guns in his pocket and returned to the Double Tree. [The Petitioner] got on the elevator and rode up to the third floor. [The Petitioner] got off on the third floor because, according to him and his statement, he thought some people in the elevator had seen his guns. When [the Petitioner] got off at the third floor, he transferred to the stairwell and climbed the stairs to the ninth floor.

Now, some of the members of his travel party had their room on the night before including Arthur Warren and others. When [the Petitioner] got off on the ninth floor at the stairwell, he encountered Mr. Warren as well as several other people who were traveling with them. Arthur Warren . . . was the ex-husband of [the Petitioner]'s current wife; and he said something to [the Petitioner] right there in front of the elevator doors about, "Why did you hit Bobby?"

Somewhere between getting off on the third floor and climbing the steps to the ninth floor, [the Petitioner] had obtained a fire extinguisher. Well, [the Petitioner] hit Mr. Arthur Warren with the fire extinguisher in front of several witnesses and then pulled out one of the thirty-eights and shot him three times. [The Petitioner] shot him in the neck, the face, and the shoulder. Then [the Petitioner] ran back to the stairs; and . . . according to [the Petitioner], at that point, he began using some of his military training to try to reach higher ground[.] [He] figured out he couldn't get up the stairwell and started coming back down.

Because it was July the 4th weekend, there was a lot going on in the Beale Street/AutoZone Park area. People heard the gunfire and went running out of the hotel. There were a lot of police officers there at Autozone Park working the Redbirds game as well as extra officers there just working Beale Street. So, officers responded almost immediately to the shots-fired call that went out as a result of [the Petitioner] shooting Arthur Warren.

While on the stairwell, [the Petitioner] could hear the officers coming up the stairwell. He saw their weapons drawn. One of the officers [the Petitioner] encountered was Memphis Police Officer Timothy Warren. In fact, the [Petitioner] has confessed that when he . . . looked out around one corner, he saw Officer Tim Warren doing likewise around the corner as he was going up the stairwell looking for the shooter.

- 3 -

At that point in time, the [Petitioner] pulled one of his guns out again and shot Memphis Police Officer Timothy Warren striking him in the head. Officer Warren fell. The [Petitioner] approached his body, took his weapon, and placed fire extinguishers — two — around his body.

According to the [Petitioner], his plan was to retreat again; and when he got away, he was going to wait for other officers he knew were coming to help Officer Tim Warren; and he was going to shoot the fire extinguishers, thereby injuring other police officers. Luckily that didn't happen. Other officers did come up the stairwell, and when they found Officer Tim Warren, they immediately got him out of the stairwell, [and] continued clearing the stairwell. They encountered the [Petitioner] who acted as though he was just an innocent bystander and waived his arms around and said the suspect's up there — it's not me, it's not me. Because he had a very distinctive hairstyle, goatee, and clothing, they recognized the description that had gone out in the first shooter call. [The Petitioner] was detained by some of the officers. The others went up one more floor. When they went up one more floor, they found the two thirty-eights as well as Officer Warren's forty caliber police issued [pistol].

. . .

Arthur Warren was likewise transported to The Med as was the [Petitioner] who obtained superficial injury during the course of [the police] taking him into custody. [The Petitioner] was transported to The Med by an officer by the name of Eric Lee; and while at The Med, the [Petitioner] said, in front of this police officer, as well as one of the nurses, "You killed a cop, man, are you happy now?" - talking to himself.

. . .

. . . The medical examiner ruled both deaths [of Mr. Warren and Officer Warren] to be a homicide as a result of being shot[.] . . .

The Petitioner testified that he had completed high school and was not under the influence of any medications or illegal substances. The Petitioner affirmed that he understood he had the right to proceed to trial, to testify or not testify at trial, to cross-examine the State's witnesses, and to present his own witnesses and that he was waiving those rights by pleading guilty. The Petitioner agreed that the State had withdrawn its death penalty notice as a part of the plea agreement and that the resulting convictions could be used to enhance a future sentence. The Petitioner agreed that he was pleading

- 4 -

guilty to two counts of first degree murder, that he was receiving two consecutive sentences of life without parole, and that his charge of aggravated assault was being dismissed. The trial court asked the Petitioner multiple times if his pleas were voluntary and if anyone had threatened or forced him to plead guilty; the Petitioner stated that his guilty pleas were voluntary and that no one had threatened or forced him to plead guilty. The Petitioner also stated that he was satisfied with trial counsel's representation. The Petitioner stated that he signed the plea petition voluntarily and that he understood the ramifications of his guilty pleas. The trial court accepted the Petitioner's guilty pleas and found that the Petitioner had knowingly and voluntarily entered his guilty pleas.

*Post-Conviction Proceedings*

On October 16, 2014, the Petitioner filed a timely pro se petition for post-conviction relief, which alleged, in part, that he was denied effective assistance of counsel. Thereafter, the Petitioner filed an amended petition for post-conviction relief, which alleged that the Petitioner received ineffective assistance of counsel because lead trial counsel coerced the Petitioner to plead guilty and "failed to properly advise and instruct [the] Petitioner as to the entering of the guilty plea[s]" and that the Petitioner's guilty plead were unknowing and involuntary.

At the post-conviction hearing, lead trial counsel[1] testified that, prior to his current position as the Judge of Division 9 of Shelby County General Sessions Criminal Court, he worked for four years as the leader of the Shelby County Public Defender's Office's capital defense team. Lead trial counsel stated that he had been licensed to practice law for twenty-four years and that the majority of his practice was criminal defense, particularly first-degree murder cases. Lead trial counsel stated that the capital defense team was appointed to represent the Petitioner around July 5, 2011. He testified that investigators and mitigation specialists worked on locating and interviewing witnesses for the conviction stage as well as the sentencing stage of trial. Lead trial counsel stated that the capital defense team met with their clients once a week, on average. He stated that the capital defense team "explor[ed] the facts of the case, which included everything from interviewing every witness that we could locate," "obtaining information regarding surveillance tapes that were at the hotel . . . , [and] looking into all the records of . . . the other victim in this case who was previously married to [the Petitioner]'s wife at the time." Lead trial counsel stated that the capital defense team also researched the possibility of arguing the defense of intoxication. He testified that he reviewed the evidence from the State several times and noted that the State filed a death penalty notice

---

[1] It appears from the record that multiple attorneys on the capital defense team at the Shelby County Public Defender's Office represented the Petitioner. However, the Petitioner's allegations of ineffective assistance of counsel only involve the leader of the capital defense team, whom we will refer to as "lead trial counsel."

on April 18, 2012. After all this preparation, lead trial counsel stated that he "did not think [that he] and the team or any lawyer at that time had the ability to successfully defend the first degree murder cases[]" because the jury would likely be sympathetic to the deceased victims. In lead trial counsel's opinion, the best result that the Petitioner could have received at trial was a sentence of life without parole. However, lead trial counsel noted that if the Petitioner proceeded to trial, he would have likely been convicted and would have received the death penalty because "it was factually such a bad case[]" and the Petitioner could not have successfully applied the defense of intoxication at trial.

Lead trial counsel stated that the capital defense team "would never, ever tell somebody to plead guilty[,]" nor would they "ever tell anybody to go to trial[.]" Instead, lead trial counsel stated that he and the capital defense team "would certainly outline what the pitfalls of either decision would be and what the benefits of each decision would be." Lead trial counsel testified that he and the capital defense team explained to the Petitioner that the current case law in Tennessee and the facts of the case were not in his favor, and lead trial counsel stated that the Petitioner "understood that[,]" "had great remorse in this case[,]" and "did not want to expose any of the families involved to more grief than they . . . already had." He stated that he and the capital defense team discussed with the Petitioner the possibility of negotiating a plea agreement with the State. However, lead trial counsel stated that, for approximately two years, he "essentially begg[ed] to let [the Petitioner] plead to this case," but the State declined. When the State agreed to let the Petitioner plead guilty, lead trial counsel stated that it was the Petitioner's decision to enter the pleas, but he noted that he did not discourage the Petitioner from pleading guilty.

Lead trial counsel stated that he did not coerce the Petitioner into pleading guilty; however, he stated that he was "always honest with [his] clients[]" and that he gave his clients his opinion on whether the client had a chance of winning at trial. Lead trial counsel stated that, when a client was interested in pleading guilty, he would bring a blank plea petition to the client and give the client an opportunity to read the paperwork. Then, he gave the client a copy with the information filled out, and he would again give the client an opportunity to read the paperwork. After the client had a day or two to read the paperwork, lead trial counsel "would come back down and go over it with them another time . . . [and] see what questions they had." Lead trial counsel stated that he believed that the Petitioner's pleas were knowing and voluntary and that the Petitioner "knew what he was doing[.]" Regarding the Petitioner's claim that lead trial counsel's advice about filing a post-conviction petition was deficient, lead trial counsel stated that he always told his clients, and informed the Petitioner, that a trial or guilty plea was "not the end of the road[]" because they had the right to appeal their conviction after a jury

trial, to file a post-conviction petition based on ineffective assistance of counsel, or to file a petition for error coram nobis relief if new evidence was discovered.

On cross-examination, lead trial counsel stated that, based on the case law in effect when the Petitioner pled guilty, the odds that the Petitioner would "win" at trial "were very, very low." Lead trial counsel stated that future changes in case law or statutes could affect a client's chances at the post-conviction stage if the new law was retroactive in its application. He did not know if anyone on the capital defense team had informed the Petitioner that his "chances" on post-conviction were better than his chances at trial; however, lead trial counsel stated that he did not think that the Petitioner "had a chance at trial to get any result outside of life without parole, the way the facts were in the case and the way the law was." Lead trial counsel agreed that, if the Petitioner had proceeded to trial, been convicted, and received the death penalty, he "would have had issues that the lawyers [c]ould have focused on, which mainly would have been the constitutionality of execution." Lead trial counsel agreed that the Petitioner might have had more avenues of appeal if he had proceeded to trial, but lead trial counsel stated that "the strategy of going to trial for the purposes of building issues for an appeal [was] not a solid defense strategy."

On redirect-examination, lead trial counsel testified that he negotiated a plea agreement with the State at the Petitioner's request "for the purpose of serving the wishes of the client, and it was also for the purpose of saving [the Petitioner's] life." Lead trial counsel agreed that, despite the overwhelming proof against the Petitioner, he and the capital defense team investigated the possibility of arguing the defense of intoxication to the jury, as well as the defense of the "wounded warrior gene." On recross-examination, lead trial counsel stated that the Petitioner "wanted to plead guilty" and "did not want to face a trial. He did not want to put the family through that again." However, lead trial counsel agreed that he advised the Petitioner to plead guilty in the hope that case law or statute in Tennessee might change in the future. Lead trial counsel stated that, even if he had not advised the Petitioner to pursue post-conviction relief, the Petitioner would have still pled guilty. Lead trial counsel stated that the Petitioner did not have a criminal record before committing the immediate offenses and that the Petitioner was unfamiliar with the criminal justice system. As such, lead trial counsel and the capital defense team spent a lot of time with the Petitioner.

The Petitioner testified that he spoke with lead trial counsel and the capital defense team frequently about his case and discovery. He stated that he did not want to plead guilty, even though he understood that the weight of the evidence was against him. The Petitioner stated that he wanted to proceed to trial because he "committed two murders" but was "not guilty of first-degree murder." He stated that lead trial counsel informed him that he had "a better chance pleading guilty and filing a post-conviction [petition]

than going to trial and fighting [his] case on death row." He believed that lead trial counsel did not want to proceed to trial because the Petitioner would lose and because lead trial counsel "wanted a quick settlement." Lead trial counsel also told him about filing a petition for habeas corpus relief, but the Petitioner stated that lead trial counsel did not explain that legal avenue. The Petitioner stated that his understanding of post-conviction relief was that he would be able to file a post-conviction petition on "certain grounds" and that he would be able to withdraw his guilty pleas and either "have a trial or a reduction in sentence." He clarified that he understood that, if the post-conviction court granted his petition for relief, he would receive a new trial and could possibly face the death penalty again. The Petitioner testified that he did "not really" understand that the main issue on post-conviction would be whether he received effective assistance of counsel; instead, the Petitioner believed he would be able to present arguments on the allegedly coerced statement he gave to the police, prosecutorial misconduct, and other grounds. The Petitioner agreed that, during the guilty plea submission hearing, he understood that he was pleading guilty to two counts of first degree murder and that he would receive two consecutive sentences of life without parole.

On cross-examination, the Petitioner agreed that he understood the terms of his plea agreement and that he understood the trial court when it informed him that he was waiving his right to appeal the convictions by pleading guilty. He did not inform the trial court that he was pleading guilty because he hoped to have a better chance of collaterally attacking his convictions than if he received the death penalty because he "was told not to bring that up" by lead trial counsel and "because [he] wouldn't be allowed to enter the guilty plea[s]." The Petitioner agreed that he had other avenues by which he could collaterally attack his convictions besides petitioning for post-conviction relief. The Petitioner agreed that he did not want to receive the death penalty but "not at the cost of life in prison." He stated that he believed that he had a better chance of "getting some of this time back" if he had proceeded to trial with the potential of receiving the death penalty than proceeding through a post-conviction petition. On redirect-examination, the Petitioner agreed that, other than filing a federal habeas corpus petition, his only current avenue of attacking his convictions was through petitioning for post-conviction relief.

The post-conviction court questioned the Petitioner, who stated that he understood that he would not receive a lesser sentence if the post-conviction court granted relief. The post-conviction court explained to the Petitioner the elements of first-degree premeditated murder and the State's burden of proof. The Petitioner agreed that lead trial counsel filed motions for impeachment information, exculpatory information, arrest history of potential witnesses, police reports, witness statements, other discovery, and for the list of witnesses that the State planned on calling during both phases of the trial. The Petitioner also agreed that lead trial counsel filed a motion asking the trial court to suppress the Petitioner's statement to the police on the grounds that the confession was

involuntary. He agreed that he pled guilty because he believed that he could raise arguments in his post-conviction petition that would have been raised after a jury trial, such as the suppression of his confession, and because lead trial counsel "told [him] it would be easier to fight [his] case o[n] post-conviction." The Petitioner asserted that lead trial counsel should have proceeded to trial, but he agreed that it was his decision to plead guilty, not the decision of lead trial counsel. The Petitioner agreed that he killed two people, but he asserted that he was guilty of second degree murder, not first degree murder.

The post-conviction court noted that the trial court ordered the Petitioner to undergo a mental health examination and that the Petitioner was determined to be competent to stand trial. The post-conviction court found that the Petitioner's case was "properly investigated" and "properly prepared[,]" that "[the Petitioner] was properly advised by his attorney[,]" and that, at the guilty plea submission hearing, the Petitioner "repeatedly" told the trial court that he was satisfied with lead trial counsel's representation and that he wanted to plead guilty. The post-conviction court noted that "once a plea has been knowingly and voluntarily entered, it is not subject to nullification . . ." because the Petitioner "is no longer satisfied with the plea for which he bargained," citing *Mikel Hamrick v. State*, No. W2011-02275-CCA-R3-PC, 2012 WL 6629632, at * 6 (Tenn. Crim. App. Dec. 19, 2012), *perm. app. denied* (Tenn. Mar. 5, 2013). The post-conviction court concluded that the Petitioner knowingly and voluntarily pled guilty.

Following the hearing, the post-conviction court entered a written order denying relief. The post-conviction court found that, at the post-conviction hearing, "the Petitioner provided inconsistent and contradictory testimony." The post-conviction court credited the testimony of lead trial counsel and credited "the [P]etitioner's testimony during the guilty plea hearing over his testimony at the post-conviction hearing." The post-conviction court also found that "[t]he lengthy and extensive colloquy between the Petitioner and the trial court at the plea submission hearing indicates that the trial court asked the Petitioner if the guilty plea[s] w[ere] freely and voluntarily made." The post-conviction court concluded that the Petitioner "failed to prove that his guilty plea[s] w[ere] not knowing or voluntary." The post-conviction court found that lead trial counsel "properly investigated this case[,]" interviewed witnesses, visited the Petitioner and his family members, and discussed the discovery materials with the Petitioner. The post-conviction court also concluded that the "[P]etitioner failed to present any evidence at the evidentiary hearing regarding how further investigation might have benefitted the [P]etitioner." The post-conviction court concluded that the Petitioner had failed to establish that he was prejudiced by lead trial counsel's representation and noted that the

Petitioner "faced a much greater sentence if convicted by a jury." The Petitioner failed to timely appeal the post-conviction court's order.[2]

## II. Analysis

### *Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Whether a guilty plea is intelligent and voluntary is a mixed question of law and fact. *Jaco*, 120 S.W.3d at 830-31. "[T]he issues of deficient performance by [trial] counsel and possible prejudice to the [petitioner] are mixed questions of law and fact[.]" *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

### *Ineffective Assistance of Counsel*

On appeal, the Petitioner argues that lead trial counsel "was ineffective in [his] representation when he misled the [Petitioner] in the events leading up to the [Petitioner's] entering a guilty plea." The Petitioner asserts that while lead trial counsel knew that the scope of post-conviction relief from a guilty plea is "extremely narrow[,]" he did not explain the scope of post-conviction relief to the Petitioner and "knowingly misled the [Petitioner], a man without any criminal history or familiarity of the process, into thinking there was relief afforded to him through a post-conviction [petition] of a guilty plea." The State contends that the Petitioner did not receive ineffective assistance

---

[2] On May 2, 2016, the Petitioner filed a motion to waive the timely filing of the notice of appeal. In an order dated May 11, 2016, this court found that "it [was] in the interest of justice to waive the timely filing of the [Petitioner]'s notice of appeal" and granted the Petitioner's motion.

of counsel because lead trial counsel stated that the Petitioner always wanted to plead guilty and because "the [P]etitioner's belief that he would have a more favorable outcome at trial or on appeal of a conviction based on an intoxication defense lacks any foundation."

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley,* 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. *Hill v. Lockhart*, 474 U.S.52, 58 (1985); *Don Allen Rodgers v. State*, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *4 (Tenn. Ct. Crim. App. April 26, 2012). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. *See Hill*, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

In the case under submission, the post-conviction court credited the testimony of lead trial counsel and found that the testimony of the Petitioner at his guilty plea submission hearing was truthful but his testimony at the post-conviction hearing was not. We may not disturb these credibility findings on appeal. *See Fields*, 40 S.W.3d at 456. At the guilty plea submission hearing, the Petitioner testified that he was satisfied with lead trial counsel's representation and that his guilty pleas were knowing and voluntary. At the post-conviction hearing, lead trial counsel testified that the Petitioner wanted to plead guilty because he did not want to put his family and the victims' families through the stress of a trial. Lead trial counsel also testified that he "begged" the State to negotiate a plea agreement "for the purpose of serving the wishes of the client, and it was also for the purpose of saving [the Petitioner's] life." Lead trial counsel agreed that he advised the Petitioner to plead guilty because he had a possibility of attacking his convictions collaterally through a petition for writ of error coram nobis or petition for post-conviction relief. He agreed that the Petitioner might have had more avenues of appeal if he had proceeded to trial, but he stated that "the strategy of going to trial for the purposes of building issues for an appeal is not a solid defense strategy." The post-conviction court found that the Petitioner "repeatedly" told the trial court that he was satisfied with lead trial counsel's representation and determined that lead trial counsel properly advised the Petitioner regarding his options of proceeding to trial or pleading guilty. The post-conviction court also concluded that the Petitioner had failed to establish that he was prejudiced by lead trial counsel's representation and noted that the Petitioner "faced a much greater sentence if convicted by a jury."

The record on appeal does not preponderate against the post-conviction court's factual findings. It is clear that the weight of the evidence in this case was against the Petitioner. Several witnesses observed the Petitioner hit Mr. Warren in the head with a fire extinguisher and then shoot him multiple times. The Petitioner then retreated up the stairs and shot Officer Warren. The Petitioner confessed to shooting and killing Officer Warren in a statement to police. Lead trial counsel advised the Petitioner to plead guilty because, if he proceeded to trial, he would most likely have been convicted of first degree murder and sentenced to death. Lead trial counsel also advised the Petitioner that he

could pursue a collateral attack on his convictions by petitioning for post-conviction relief based on ineffective assistance of counsel or because new evidence could be discovered or the current law could change in the future. We agree with the post-conviction court that the Petitioner has failed to establish that lead trial counsel's performance was deficient or that he suffered any prejudice, *see Jeremy Young v. State*, No. W2012-01193-CCA-R3-PC, 2013 WL 3865237, at *11 (Tenn. Crim. App. July 22, 2013), *perm. app. denied* (Nov. 14, 2013) (affirming the post-conviction court's denial of relief where the petitioner argued that trial counsel "improperly led him to believe that he could get his conviction overturned on post-conviction" but the record did not support the allegation). The Petitioner is not entitled to relief on this ground.

*Unknowing and Involuntary Guilty Plea*

The Petitioner argues that his guilty pleas were unknowingly and involuntarily entered because of lead trial counsel's deficient representation and because he lacked familiarity with the criminal proceedings. The State contends the Petitioner's pleas were knowing and voluntary because lead trial counsel's performance was not deficient and the trial court conducted a proper plea colloquy.

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case *Boykin v. Alabama*, 395 U.S. 238 (1969), and the state standard as announced in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), *superseded on other grounds by* Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). *Don Allen Rodgers*, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." *Boykin*, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, *i.e.* that he has been made aware of the significant consequences of such a plea . . . ." *Mackey*, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . ." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting *Boykin*, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin*, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options

- 13 -

available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship*, 858 S.W.2d at 904; *Howell v. State*, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. *Boykin*, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conculsory allegations unsupported by specifics." *Id.* at 74.

As noted above, the post-conviction court credited the Petitioner's testimony from the guilty plea submission hearing; there, the Petitioner consistently informed the trial court that his guilty pleas were knowledgeable and voluntary. We conclude that the trial court conducted a thorough Tennessee Rule of Criminal Procedure 11(b) plea colloquy; the trial court repeatedly asked the Petitioner if it was his desire to plead guilty and if his plea was knowing and voluntary. The trial court also informed the Petitioner of the rights he was waiving and discussed the sentence he would receive. The totality of the circumstances of the Petitioner's pleas shows that they were voluntary and knowing. Again, lead trial counsel stated that he negotiated with the State regarding a plea agreement because the Petitioner wanted to plead guilty. Lead trial counsel investigated the possibility of asserting a defense at trial based on intoxication or the "wounded warrior" gene, but he advised the Petitioner to accept the State's plea offer because the Petitioner would likely be convicted and sentenced to death if he proceeded to trial. The Petitioner completed high school, and although he had no previous criminal history, lead trial counsel testified that he and the capital defense team visited the Petitioner at least once a week partly due to his lack of familiarity with the criminal justice system. It appears from the record that the Petitioner chose to plead guilty to avoid the death penalty and so that his family and the victims' families would not have to go through a trial. Lastly, we note that by pleading guilty and receiving a sentence of life without parole, the Petitioner avoided receiving the death penalty. "The entry of a plea of guilty to avoid a death sentence or risk greater punishment does not, standing alone, make the plea involuntary." *Parham v. State*, 885 S.W.2d 375, 381 (Tenn. Crim. App. 1994). The post-conviction court did not err in its conclusion that the Petitioner's guilty pleas were knowing and voluntary. The Petitioner is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE